## CITY OF DALLAS v. GEORGE.

### No. 2186.

Court of Civil Appeals of Texas. Eastland.

Nov. 14, 1941.

Rehearing Denied Dec. 12, 1941.

H. P. Kucera, A. J. Thuss, and Chas. E. Long, all of Dallas, for appellant.

Chrestman, Brundidge, Fountain, Elliott & Bateman, of Dallas, for appellee.

LESLIE, Chief Justice.

The City of Dallas, originally instituted this suit against R. B. George and the State Fair of Texas, a corporation, as defendants, seeking to recover a large sum of money charged to have been converted by defendant George, or withheld by him knowing it to be in equity the property of the plaintiff.

The City also prayed for an injunction against George restraining him from interfering with its exclusive ownership and control of the Fair Park. The cause was tried before the court and jury, and at the conclusion of the testimony the court granted a motion of the defendant George for an instructed verdict against the City. A judgment was entered accordingly and this appeal is prosecuted from that action of the trial court.

In its statement of the case, the City states the purpose of the suit as one also "seeking an accounting from R. B. George and The State Fair of Texas under and by virtue of certain contracts * * *." On its first appearance in the case, The State Fair applied to the court and obtained permission to align itself with the City of Dallas as plaintiff, instead of as co-defendant with R. B. George and adopted the pleadings and sought the same remedy against George as that prayed for by the City. At the conclusion of the trial, however, the State Fair moved for an instructed verdict in its favor against the City of Dallas and in favor of R. B. George, which said motion was likewise granted. As stated by the City, it thus appears that the State Fair at the conclusion of the trial "switched its position from that of co-plaintiff with the City of Dallas (assumed in the outset) to that of co-defendant with R. B. George."

In this opinion, The State Fair of Texas, a private corporation, will be spoken of as the "Fair"; the Texas Centennial Central Exposition, a private corporation, as the "Centennial"; the Greater Texas Pan American Exposition, a private corporation, as "Pan American"; and the City of Dallas, a municipal corporation, as the "City." (All italics herein are ours.)

The different contracts between the parties affecting the rights and forming the basis of respective claims, or the pertinent parts thereof, will now be noticed:

On May 8, 1924, the City and the Fair entered into a contract whereby the latter undertook for a period of 20 years from that date to conduct an annual State Fair in a public park belonging to the City of Dallas, known as Fair Park. By that contract the City turned over to the Fair for a limited time each year said Park for the purpose of preparing for and presenting an annual State Fair and holding exhibitions in connection therewith. The Fair was granted the privilege of holding an annual race meet, carnival, or other entertainments. The contract provided for care of the property, repairs of buildings, general supervision, etc., during its life. The income from admission fees, concessions, etc., were to be devoted by the State Fair to purposes reflected by the following provisions thereof:

"That it is further mutually understood that all receipts and revenues of whatever nature, unless otherwise provided for by special contract that may now exist or may hereafter exist between the said Park Board and the State Fair of Texas, shall be used and appropriated for and applied to, the following purposes and none other:

"(a) For the purposes of conducting and maintaining an Annual Fair, Exposition and Entertainment of a *high grade and excellence,* as contemplated herein.

"(b) For the purpose of insuring a Spring Carnival, Festival, *Entertainment or Race Meeting* in the spring of each year.

"In this connection, it is distinctly understood the payment of premiums, purses, attractions and other expenses necessary *to the conduct of a first-class annual fair,* exposition and entertainment, and a spring carnival, festival, *entertainment or race meeting* in the spring of each year, *shall be deemed to be a proper application of such funds.*

"(c) For permanent buildings and improvements of said grounds suitable and appropriate for Fair purposes.

"(d) For Park Purposes.

"It is further mutually understood that unless otherwise provided by special contract between the said Park Board and the State Fair of Texas, the funds shall be set aside and appropriated in the order hereinabove set forth; provided, that after the

necessary funds are set aside for the conduct of the annual Fair and Exposition and the Spring Carnival, Festival, Entertainment or Race Meeting, as provided by subdivisions (a) and (b) hereof, such remaining funds and revenues may be kept in tact with the consent of the Park Board for the construction of any particular improvement until such fund is increased to a sufficient amount to make any such particular improvement. That *in case of emergency, the future receipts to be derived from the operation of the State Fair may be pledged to aid in carrying out the making of any particular improvement agreed upon by and between said Park Board* and the State Fair of Texas; provided that in all such cases the said State Fair of Texas, as well as the Park Board of the City of Dallas, shall not pledge any such receipts so as to jeopardize the success of opening and conducting the annual Fair, Exposition and Entertainment, as herein provided."

Paragraph 24 states again the purpose of that contract in this language: " * * * the true purpose and spirit of this agreement is to create a cordial cooperative relationship between the City of Dallas on the one part and the State Fair of Texas on the other, in securing and perpetuating of the giving of an annual Fair, Exposition and Entertainment of a high standard of excellence."

This contract is signed "The City of Dallas by Park Board, by L. Blaylock, Mayor, President of Park Board", and State Fair of Texas by its president.

Another provision of that contract is in part as follows: "It is further mutually understood that all buildings or other improvements of a permanent nature placed in or upon said Fair Park from whatever fund, *shall be and remain the property of the City of Dallas,* subject to the right of the use thereof by the State Fair of Texas in accordance with the terms of this contract and agreement."

The contract further provided that: "The State Fair of Texas agrees, at its own cost and expense, to assume all the necessary upkeep and repair to all buildings and improvements now used for fair and exposition purposes for the entire term of this agreement, as well as such as may be hereafter built or constructed under the terms of this contract, and in consideration thereof *shall have control of and receive*

*all revenues from all sources within said Fair Park during the life of this contract* * * *."

Thereafter, on February 24, 1934, the Fair, City, Park Board, and R. B. George entered into a contract whereby certain expensive improvements were to be added to the Fair Park. In one paragraph that contracts provides: "Whereas, the State Fair desires to erect and construct on its lands and within the enclosure known as Fair Park, a race track for racing horses, grandstands, booths for the certificate system of contribution and distribution, stables, barns and other improvements necessary and proper for the operation of a modern racing plant or unit, and the said State Fair has requested said R. B. George to advance the sum of $141,000 to be used, disbursed and expended in the manner and way and by the persons hereinafter designated, in the construction and erection of said race track and racing plant, which the said R. B. George has agreed to do on the conditions hereinafter recited, * * *"

To facilitate construction of such improvements it became necessary to remove the fish hatchery from the Fair grounds, and that was to be done at the expense of the Fair, and in a further paragraph of that contract it was provided: "In consideration of the said R. B. George's *giving* to the State Fair of Texas the sum of $141,-000, or such part thereof as may be necessary to build said race track and racing plant, it is agreed that said R. B. George shall receive 60 per cent of the net receipts from the operation and running of said track and plant for a period of ten years; that is to say, up to and including the 8th day of May, 1944, the expiration and ending date of said agreement between the City of Dallas and the Park Board of the City of Dallas on the one hand, and the State Fair of Texas on the other. But it is expressly understood and agreed that this contract with the said R. B. George shall not extend beyond the period of the agreement between said Park Board of the City of Dallas, the City of Dallas, and the State Fair of Texas. And it is agreed that the remaining 40 per cent of the said net receipts shall *belong to and be owned by the State Fair of Texas,* with the distinct understanding that there shall be donated to charity from each racing meet one day's net receipts, or an amount equal to an average day's net receipts; * * *."

Another material paragraph of that contract between the four parties reads: "In the event the total cost of the construction and the building of said race track shall exceed the sum of $141,000, *then such excess sum shall be considered as owing by the race track unit to R. B. George,* and such excess sum, if any, shall be advanced by the said George, but not in excess of $20,000, and such excess sum shall be repaid to the said R. B. George out of the total gross receipts of the racing unit * * * If any part of said fund is not expended in the construction, erection and building of said race track plant, its buildings and improvements, such sum so remaining after full completion of said race track, its buildings and improvements, shall be returned to the said R. B. George."

Paragraph 16 of that contract provides: "It is agreed between the State Fair of Texas on the one hand, and the City of Dallas and Park Board of the City of Dallas on the other, and only between the parties mentioned in this paragraph, that the State Fair of Texas, in consideration of the City of Dallas giving the State Fair of Texas an easement on its fish hatchery at White Rock Reservoir, said State Fair of Texas will build and construct, without expense to the City of Dallas and the Park Board of the City of Dallas, at Fair Park, a race track of modern design for horse racing, and also necessary improvements and appurtenances thereto, and construct the same at a cost of *not less* than $140,000, and the title and *ownership of said property to be considered as owned by and vested in the City of Dallas, free of all liens and encumbrances, and said property to continue to be a part of the Fair Park properties of the City of Dallas,* and a part of the property subject to that certain agreement between the City of Dallas and the Park Board of the City of Dallas on the one hand, and the State Fair of Texas on the other, which agreement is dated the 8th day of May, 1924 * * *."

The construction of the race track proceeded, but the expenses thereof exceeded by considerable amount any sum apparently contemplated by the parties to that undertaking. This is evidenced by another contract entered into on April 24, 1934, between the State Fair of Texas and George. Its provisions state the situation then confronting the enterprise in this wise:

"Whereas, the said R. B. George has advanced the said sum of $141,000, which has been wholly expended in the construction and building of said race track and racing plant, and the said R. B. George has also advanced said additional $20,000 which has also been properly expended for like purposes, and the necessary cost of completing said race track and racing plant will exceed the total sum of $161,000 by an amount not yet determined, but which will approximate an additional $70,000; and

"Whereas, under the terms of the said original contract no part of such additional cost of construction is to be paid by R. B. George, and all costs of construction and equipment in excess of said $161,000 must be borne by the State Fair of Texas; and

"Whereas, the State Fair of Texas has obligated itself to the Texas Racing Commission in the sum of $10,000, conditioned upon the completion of said race track and racing plant by April 28, 1934, and is in danger of forfeiting said amount as liquidated damages; and

"Whereas, the State Fair of Texas has entered into contracts with various racing officials for their services at a racing meet to be held at Fair Park beginning April 28, 1934, and large sums of money have been spent advertising said meet, and many horses are now in the barns, all of which facts require that said race track and racing plant be completed at once, otherwise irreparable loss will be suffered by the State Fair of Texas; and

"Whereas, the State Fair of Texas has requested R. B. George to advance to it the sums of money necessary, in the option of the Racing Executive Committee, to complete the construction of said race track and racing plant by April 28, 1934, such money to be used only in the payment of bills for labor and material actually going into such construction and equipment, and R. B. George has consented to make said advances, conditioned that he be repaid the sums of money so advanced, with 6 per cent interest thereon, from the *first moneys* that would otherwise be payable to the State Fair of Texas *under the terms of said contract of February 24, 1934, to-wit, its 40 per cent therein mentioned;* and

"Whereas, no revenues of any kind or character can possibly accrue to the State Fair of Texas from the said race track and racing plant unless the same is completed as aforesaid and until the total cost of construction and equipment thereof has been fully paid;

"Now, Therefore: * * *

"The said R. B. George obligates and binds himself to advance said additional sums of money, estimated at approximately $70,000, as may be needed to complete the construction and equipment of said race track and racing plant by April 28, 1934 * * *."

Said advances were to be repaid exclusively from the Fair's 40 per cent provided for in paragraph 3 of the contract of February 24, 1934, and were "to be repaid before any revenues from the race track and racing plant" accrued to the Fair and "The State Fair of Texas does hereby set over to R. B. George all of said 40 per cent of net receipts of said racing plant until such loan with 6 per cent interest is fully paid to the said R. B. George." Such amounts (of the 40 per cent) as were collected were deposited in the bank as a trust fund in favor of George to secure the repayment of "said additional advances with interest", etc.

On the 18th day of June 1935, the City of Dallas, State Fair, Park Board and the Texas' Centennial entered into a contract whereby the Fair relinquished to the Centennial the fair grounds for the balance of the year 1935 and 1936 so as to get ready to hold the Texas Centennial in Dallas. In this four-party contract the City required the Centennial to recognize the contract between the State Fair, the City and Park Board with George dated February 24, 1934 *"and the contract dated April 24, 1934, between the State Fair and R. B. George"* and to agree that while the premises are in the hands of the Centennial, and subject to any amendment of the existing contract that Texas Centennial might make with George with respect to the operation of the race track, "the funds which otherwise would be payable to the State Fair of Texas, to-wit, 40 per cent of the net proceeds, *after the payment of any advancements due to R. B. George for the account of the State Fair of Texas are repaid,* shall be deposited in * * * Bank in a special trustee's account."

In part, this June 18th contract provided: "(b) The Texas Centennial Central Exposition agrees and recognizes the contracts between the State Fair of Texas, the City of Dallas, and the Park Board with R. B. George, dated February 24, 1934, and the contract dated April 24, 1934, between the State Fair of Texas and R. B. George; the Exposition Corporation, however, is here- with negotiating an amendment of such contracts with R. B. George which shall be effective for the period only that the Exposition Corporation is entitled to use and occupancy of any of the Fair Park premises hereunder, only if and when the City of Dallas and its Park Board join in the amendment."

The suggested amendment contemplated, among other things, the re-location of certain stables, the destruction of other properties, expense of removal, etc., and in addition, the June 18th contract further provided: "Subject only to any amendment of the existing contract with R. B. George hereinabove referred to, the operation of the race track during the racing season shall be under the terms of such existing contracts as are valid and the proceeds of such operations of the race track shall be divided and disbursed in accordance with such existing contracts [1924 and 1934] excepting only that during the time the Exposition Corporation has possession of the Fair grounds and during such time only, the funds which otherwise would be payable to the State Fair of Texas, to-wit, the 40 per cent of the net proceeds after the payment of any advancements due to R. B. George for account of the State Fair of Texas are repaid, shall be deposited in the Republic National Bank & Trust Company * * *."

In harmony with these agreements and to accomplish the general purposes of all parties and promote the Centennial at Dallas, the Centennial, the Fair and R. B. George, on the 28th day of January, 1936, entered into a contract (approved by the City) whereby the Centennial agreed to pay George to forego holding races in the fair grounds during 1936 and also permit the destruction of certain parts of the racing plant. George accepted the proposition and a like option extended over 1937. This arrangement between said parties with the consent of the City contemplated that George should be paid for any *"personal losses"* which he sustained "by virtue of his not being able to profit from the use of said properties for racing purposes during said year." Such loss was estimated and agreed upon at $85,000 per year. In this same contract George, the Fair and the Centennial each agreed "that they would not directly or indirectly be in any way connected with the construction or operation of any other racing track in Dallas County during the term of the Exposition * * *." Un-

der the contract of February 24, 1934 George was obligated to hold at least one race meet in the Fair Park each year, and the law permitted two such meets per year.

About March 11, 1937, the Pan American Exposition, the State Fair and R. B. George entered into a contract whereby arrangements were made for the holding of the Pan American Exposition in the Fair grounds during the year, the omission of race track operations, and to compensate George for personal losses due to elimination of race meets. Again, the City gave permission for the omission of races.

The race track was completed and put in operation and the first racing meet was held April 28 to May 22, 1934. The net profits of that meet amounted to $126,-631.32. Of this amount $6,030 was paid to charity, as provided in the contracts. The $20,000 first advanced by George under the contract of February 24, 1934 was repaid. Sixty per cent of the net profits, or $60,-367.39, was paid to George under the contract of April 24, 1934, and the balance, amounting to $40,240.53, representing 40 per cent of the net profits belonging to the Fair, was paid to George in part repayment of advancements of $102,896.86. These advancements were made by him under the provisions of the contract of April 24, 1934, under circumstances and "emergencies" requiring satisfaction of debt, removal of liens and the *completion* of the track by April 28, 1934.

The next racing meet was held October 6 to 30, inclusive, 1934, and produced a net profit of $54,330.22. Sixty per cent was allotted to George under the contract of February 1934, and the Fair's 40 per cent was paid to George on unpaid balance of loan as provided for in contract of April 24, 1934.

The third meet was held from April 25 to May 18, 1935, and produced a net profit of $49,418.36. Under the contracts, sixty per cent of this was paid to George and the Fair's 40 per cent to George on unpaid balance advanced under the contract of April 24.

The fourth and final race meet was held September 28, to October 26, 1935, and produced a net profit of $18,350.04. Of this George received his 60 per cent under the contract and the Fair's 40 per cent was also paid to George in accordance with the contract of April 24, 1924.

It is undisputed that George collected $85,000 from the Centennial during 1936 for not holding races which he had the right to do under the original contract by which he was induced to construct and complete the tracks. Likewise, he collected $42,500 from the Pan American for not holding races during the year 1937 and would have collected $85,000 from Pan American had the pari-mutuel law not been repealed before the time arrived for the holding of the second meet.

The evidence further discloses that George collected $45,000 from the Arlington Downs, or the Waggoners. In this connection, we find no evidence disclosing why the Waggoners paid this sum to George and it would be mere speculation or suspicion to say that that transaction in any way entered into or affected the contracts and transactions between the other parties.

As we interpret the plaintiff's suit, its principal theory is that the above amounts, $85,000, $42,500 and $45,000, aggregating $172,500, represent, in substance, income of the race tracks and 40 per cent thereof should have been accounted for to the City by George under the original contract of February 24, 1934. Such claim is predicated on allegations that George obtained consent of the City and the Fair to forego race meets during 1936 and 1937 without disclosing that he was getting the sums paid him by the Centennial, Pan American and the Waggoners, and that the amounts so obtained were, or should be, considered income from the operation of the race track, and 40 per cent thereof belonging to the City, etc. With respect to this contention, there is not a scintilla of testimony that George withheld from the City, or any of the other parties, any information it was his duty to disclose, or that they were not aware of all relevant facts and circumstances.

We have set out in substance the background of this litigation and somewhat in detail the immediate facts. This has been done in the belief that a full and clear statement of the case would at once suggest the answer to all questions presented by the appeal. From such statement of the case, we think it obvious that the trial court committed no error by instructing a verdict in favor of the appellee George and entering judgment accordingly.

We arrive at these conclusions after a careful study of the record in the light of each contention made by appellant. It cites but few authorities in support of its propo-

sitions, and after a review of them we are convinced that the principles of law and rules of equity stated therein have no application to the undisputed facts of this case. Certainly no possible application of them to these facts would warrant the granting to the City of any of the relief prayed for. This sufficiently disposes of this appeal.

■ Summarizing with particular reference to specific contentions, the following may be said with reference to the most material ones. As to the contention that the City had the right to recover from George, in whole or in part, the sums of money (about $102,896.80) advanced by him to *complete* the race track and which amounts had been approximately repaid to him by the State Fair under the contracts, we conclude the City showed no right of action for said amount. This is true because (1) the City had no right under any theory to the income of the Fair, as such. (2) The original contract of May 8, 1924, merely required the Fair to use its revenue in the conduct of its corporate business, namely, an Annual Fair, a Spring Race Meet, Permanent Improvements, Park Purposes, etc. When these purposes were achieved, the obligations to the City were fulfilled. Such application of the Fair's funds was the limit of the City's rights. Hence, when the Fair expended its funds in buildings or completing an improvement agreed upon by the City, it was using such funds in harmony with the spirit and purpose of the contract of May 8, 1924, which provided that the Fair should spend its funds in the order named: "(a) An Annual Fair. (b) A Spring Race Meet. (c) Permanent Improvements, and (d) Park Purposes."

(3) Further, under the contract of February 24, 1934, the City agreed that 40 per cent of the revenue of the racing plant should "belong to and be owned by the State Fair" and by separate agreement bound the Fair to construct a racing plant to cost *not less* than $140,000. When so constructed the title to this racing unit was "to be considered as owned by and vested in the City of Dallas, free of all liens and encumbrances." To provide grounds for the race track, the City also obligated the Fair to remove a fish hatchery from the Park grounds at its own expense. To accomplish that which the City obligated the Fair to do, the City necessarily authorized and bound the Fair to expend whatever of its funds were necessary to complete the improvements and structures which they mutually contemplated.

Under such circumstances it cannot be justly claimed or asserted that the City would have a right to have the plant constructed on its premises and become the owner thereof free and clear of all debt, and at the same time have a right to recover and place in its treasury the money necessarily paid out by the Fair in completing the plant, later found to have cost approximately $255,000, and to the erection of which George donated $141,000 and made a first loan of $20,000.

(4) The Fair's pledge in the contract of April 24, 1934 of its future revenues from the racing plant was not in violation of the original contract of May 8, 1924, for the reason that such pledge was made (a) in an "emergency" for the carrying out of the making of a particular improvement "agreed upon by and between the said Park Board and the State Fair of Texas." (b) The consent of the Park Board was not necessary to the pledge, but only to the erection of the improvements for which the pledge was made, and, besides there is no evidence that the Park Board did not consent fully. Neither is there any conflict or inconsistency in the contract of April 24, 1934 and that of February 24, 1934; and in the four-party contract of June 18, 1935 (City and Park Board, parties with others) it is recited and required that the Centennial recognize each of said contracts and George's rights thereunder. Doubtless all parties recognized the worthlessness of an incompleted race track unit. The provision of the contract just mentioned is elsewhere set out herein.

■ So much for the asserted right of the City to recover the sums of money borrowed by the Fair from George to complete the race track unit and *repaid* to him. We now consider the claims made by the City that it was entitled to recover 40 per cent of the $172,500 paid to George by the Centennial, Pan American and the Waggoners. The City is entitled to no part of this amount as the income of the State Fair for the following reasons, among others:

(a) No part of the sums paid George by the Centennial and the Pan American could possibly be income of the Fair, since the Fair, as well as the City, prior to the execution of the contracts under which they were paid to him, agreed such amounts

should not be so considered. As understood and agreed by the Fair and the City (contract January 28, 1936, introduced by City) such sums or income were paid for "losses R. B. George personally will sustain by virtue of his not being able to profit from the use of said properties for racing purposes * * *," and for "use of said property and improvements" (race track, structures, etc.) The sums paid by the Centennial and Pan American were merely compensation for potential race track profits going to George but lost from suspension of races.

(b) Further, it was the Centennial that finally concluded that no races should be held, and in response thereto the City and Fair, on June 18, 1935, relinquished to the Centennial the exclusive right to the use of the Fair Park, including the racing plant, for 1936, with an option for 1937, subject, however, to the contract between the State Fair, the City, the Park Board and George of February 24, 1934, and between George and the State Fair of April 24, 1934, and in which latter the Centennial was obligated to account for the State Fair's 40 per cent of any money from racing *after payment of George's loans.*

It was after said June 18th that the Centennial decided racing should be abolished. Hence, George was entitled to compensation for losses resulting from such arrangements and the $85,000 was paid in satisfaction of the same. In thus satisfying George, the Centennial was merely acting as an assignee of the State Fair and the City in the exercise of rights relinquished to it by the City and the Fair.

Under like circumstances and agreement, the Pan American (succeeding to the rights of the Centennial and with approval of the City and Fair for omission of races), paid George $42,500 to forego the racing meet in 1937. Only one race meet was held during Pan American activities and George was paid the sum of $42,500 in accordance with the contract, and if the pari-mutuel law had not barred the second race meet, Pan American would have paid $85,-000.

Obviously, these sums were received by George from the Centennial and the Pan American under and by virtue of a contract openly and fairly entered into between the parties and fully understood by all these litigants. As to the $45,000 paid to George by the Waggoners there is, as stated, no evidence tending to show that it was not a legitimate transaction, or that it was received in betrayal of any trust or obligation he owed the City or the Fair. Neither is there any evidence that George diverted or converted any money or trust fund belonging to the City or the Fair.

We are further of the opinion that there is no merit whatever in the City's plea that the trial court should have adjusted alleged equities between the litigants by dividing in the ratio of 60 per cent to George and 40 per cent to the "appellant" (City) the net profits or revenues from the racing plant, plus $172,500 received by George from the Centennial and others, after deducting therefrom $122,896.80 loaned by George in addition to the $141,000 contributed or given by him to the State Fair. To do this would amount to the making and substitution of a new contract for those originally and fairly entered into and well understood by all parties.

There is in this record no evidence of a joint enterprise between George and the City and the Fair, or between him and either of them. In all transactions George acted for himself and in this litigation stands upon the express provisions of said contracts.

■ In response to another contention, we conclude that the City showed no right to the cancellation of the contract of February 24, 1934. During the trial of this case, George and the State Fair settled all differences between them with respect to future operations of the plant, and that count in the petition, as to them, became moot. As to the City, and from its standpoint, it must be recognized that the race track unit constructed under said contract of February 24, 1934 is not confined to racing alone, and especially not to racing under the pari-mutuel system. Racing could be held without pari-mutuel betting, and the racing plant can be used for many purposes, and has been so used, as in the case of the Centennial, the Cavalcade, Cavalcade of the Americas, etc., such activities being of common knowledge.

■ Further, the contract of February 24, 1934 was valid when made, and the subsequent repeal of the pari-mutuel law did not render it invalid, but merely precluded an action in court to enforce racing under the pari-mutuel system. As contended by the appellee, there would be no basis for canceling the contract merely because one of the expected sources of revenue has been cut off by repeal of the law. In this

suit, George is not attempting to enforce any agreement that racing meets be held under the pari-mutuel system.

We believe that any fair analysis of the undisputed facts of this case disposes of it adversely to the appellant upon obvious and fundamental principles of law and equity. The judgment of the trial court is affirmed.