## CITY OF DALLAS V. R. B. GEORGE.

No. 7949. Decided February 24, 1943.
Rehearing overruled April 7, 1943.
(169 S. W., 2d Series, 473.)

*H. P. Kucera, A. J. Thuss, R. L. Dillard, Jr.,* and *Chas. E. Long, Jr.,* all of Dallas, for petitioner.

It was error for the Court of Civil Appeals to hold that the tri-party agreement between George, the State Fair, and the

City of Dallas could be violated, varied or nullified by George and the State Fair and deprive the City of Dallas of its benefits under the three party agreement, and by permitting the breach of said contract when some emergency, wholly in the mind of George, made it advantageous to his private interests to substitute a radically changed contract between himself and the State Fair. Louisville & Nashville Ry. Co. v. Mottley, 219 U. S. 467, 55 L. Ed. 297, 34 L. R. A., N. S., 671, 31 Sup. Ct. 265; Massachusetts Bonding Co. & Ins. Co. v. Gottlieb, 15 S. W. (2d) 1020.

*Chrestman, Brundidge, Fountain, Elliott & Bateman,* of Dallas, for respondent.

The City of Dallas does not have sufficient interest to maintain this suit, as the contract in controversy was approved by the city, and the city granted permission for the ommission of the races, when the racing law was repealed, and subsequent contracts between the City and the Centennial recognized same, and the only effect produced by the repeal of the pari-mutuel law was to render the contract unenforcible—not make it invalid. Banks v. Cartwright, 26 S. W. (2d) 708; Robertson v. Duncan, 71 S. W. (2d) 597; King v. Hardin Lbr. Co., 187 S. W. 401, 17 Tex. Jur. 45.

MR. JUDGE SLATTON, of the Commission of Appeals, delivered the opinion for the Court.

This suit was instituted by the City of Dallas against R. B. George and the State Fair of Texas to recover the sum of $176,-555.22. It was alleged that the State Fair of Texas wrongfully assigned and paid to R. B. George the sum of $99,390.08, being the State Fair of Texas' 40% of the net profits derived from the operation of the race track situated in Fair Park during 1934 and 1935; that George had collected from various parties the sum of $172,500.00 in consideration of his agreement not to hold race meets in the racing plant during 1936 and a part of 1937, and the State Fair of Texas and the City of Dallas should receive 40% of this sum in accordance with the contract entered into by and between the City of Dallas, State Fair of Texas and R. B. George. The City seeks to cancel the contract which authorized George to conduct race meets because of the repeal of the pari-mutuel law. The case was tried before a jury and after the City had closed its case the trial court directed a verdict against the City. On the trial the State Fair of Texas aligned itself with the City until the close of the evidence, after which it joined R. B. George in his motion for a directed verdict against the

City and in favor of George. The Court of Civil Appeals affirmed the judgment of the trial court. 157 S. W. (2d) 987.

By contract of date February 24, 1934, the State Fair of Texas, a private corporation, R. B. George and the City of Dallas entered into a contract whereby George agreed to advance $141,-000.00 for the use by the State Fair of Texas in building a race plant on property belonging to the City of Dallas, which the State Fair of Texas was entitled to use exclusively for a fair in the fall and, at its option, for a spring race meet (under the terms of a certain contract dated May 8, 1924). In the February contract of 1934 George, in consideration of advancing to the State Fair of Texas $141,000.00 and an agreement that a loan of an additional $20,000.00, to be paid out of gross receipts, would be advanced if needed, the said George was to receive 60% of the net profits of the racing plant for a period of 10 years, and the State Fair of Texas was to receive 40% of the net profits. The original contract between the City and State Fair, under which the State Fair of Texas was entitled to the exclusive use of Fair Park for 60 days in the fall and 30 days in the spring, provided that no permanent improvements should be made on the premises without the consent of the Park Board, and that all revenues of every kind whatsoever should be used by the State Fair of Texas in this order: (a) for an annual fair; (b) for a spring race meet; (c) for permanent improvements; and (c) park purposes. The original contract further provided "in case of emergency the future receipts from the operation of the State Fair may be pledged to aid in carrying out the making of any particular improvement agreed upon by and between the said Park Board and the said State Fair of Texas." In the latter part of April, 1934, and within a short time before a spring racing meet was to be held, the racing plant was practically completed and it was estimated that the cost of the racing plant would exceed the sum of $161,000.00 by $70,000.00. Thereupon the State Fair of Texas and R. B. George entered into another agreement in which, after reciting the facts, the State Fair of Texas requested R. B. George to advance the necessary money and George consented to do so, provided that he be repaid with interest from the first monies that would otherwise be payable to the State Fair of Texas under the terms of the contract of February 24, 1934. According to the audit, which was introducted in evidence by the City, the racing plant actually cost $263,891.86, which sum was advanced by R. B. George. Four racing meets were held and under the division of the net profits George received his 60% as was agreed to by the City and the State Fair of Texas, and out of the 40% of the net profits which

would have otherwise belonged to the State Fair of Texas the said R. B. George was paid all of the $102,891.86 which he had advanced to the State Fair of Texas except $17,625.60. Before June 18, 1935, the Texas Centennial Central Exposition Corporation was organized for the purpose of holding a Texas Centennial, and said corporation made a contract with the City of Dallas and the State Fair of Texas under which the State Fair of Texas relinquished its rights unto the Centennial Corporation for the use of Fair Park during the last part of 1935 and the entire year of 1936, with an option to extend the contract through 1937. The contract contemplated that racing meets would be held and required the Centennial Corporation to take the properties subject to the contract with George of February 24, 1934, and also the contract between the State Fair and George of April 24, 1934, and provided that the State Fair of Texas was to have the proceeds of its 40% applied to certain indebtedness "after the payment of any advances due to R. B. George for the account of the State Fair are repaid." Thereafter it was determined by the Texas Centennial that the racing plant should be used for another purpose and George was notified that there would be no racing during the Centennial. January 28, 1936, Texas Centennial and State Fair of Texas entered into an agreement with George whereby Texas Centennial agreed to pay George $85,000.00 in installments for the loss that George personally would sustain on account of races not being held during 1936, and at its option a like amount for 1937. In that contract it was agreed that neither of the parties would hold any other race meet elsewhere in Dallas County. It was recited in the contract that the Park Board and the City of Dallas approved the contract, and resolutions of approval were attached to the contract of both the City and the Park Board. The option to continue during 1937 was exercised by another corporation, called "The Greater Texas and Pan-American Exposition." That corporation and George and the State Fair of Texas made a contract under which George was paid $42,500 for the loss that he would personally sustain in virtue of races not being held during 1937. It was proven at the trial that George received the sum of $45,000.00 from the Waggoners, the purpose of which was not shown.

The City's contentions may be summarized under four propositions, the first that R. B. George and the State Fair of Texas violated an express agreement with the City of Dallas by attempting to assign to George the 40% net profits to be derived from the operation of the race track in payment of the money advanced by George to the State Fair of Texas for the purpose

of discharging bills for labor and material used in the construction of the plant; (2) that the sum of money collected by George from the Centennial Corporation and the Pan-American Corporation and allegedly the Waggoners under the contract between the City, The State Fair of Texas and R. B. George, should be considered a part of the net proceeds and under said contracts George should only be entitled to receive 60% thereof and the State Fair of Texas and the City should be entitled to receive the remaining 40%; (3) the trial court under its equity powers should have adjusted accounts between the City of Dallas and R. B. George by taking the total revenue derived from the plant, plus the sum received by George for not holding races, and deduct the $122,896.20 which had been advanced by George in excess of the $141,000.00 and then divide the balance between the City and George on a 60-40 basis; and (4) that because the repeal of the pari-mutuel law made performance of the contract of February 24, 1934, unlawful, the same should be cancelled.

■■ The contract of February 24, 1934, in which the City was a party, provides that 60% of the proceeds from the racing plant should be the property of R. B. George, and that the remaining 40% should be the property of and belong to the State Fair of Texas. Under the provisions of the contract of May 8, 1934, it was provided that the revenues of the State Fair of Texas should be applied to the conduct of an annual fair, a spring race meet, permanent improvements and for park purposes. The contract authorized the State Fair of Texas in an emergency to pledge its revenues in aid of any particular improvement agreed upon by the Park Board. In the contract of February, 1934, all parties agreed to the construction of a racing plant to cost not less than $140,000.00. The racing plant cost more than was contemplated by the parties. All the money advanced by George, according to the evidence introduced in the record by the City of Dallas, went into the construction of the racing plant. All parties at interest had agreed to its construction. It would seem under the contract of 1924 the parties contemplated that during the existence of the conract emergencies would arise whereby the State Fair of Texas would be compelled, and was authorized, to pledge its revenues for the purpose of making permanent improvements. There was an emergency at the time of the execution and delivery of the contract between R. B. George and the State Fair of Texas. Commitments had been made to insure a spring race meet and at the time of the contract the racing plant was almost completed and there were outstanding bills for labor and material. Under the contract George agreed to advance the money and the State Fair of Texas pledged its

revenue and income for the purpose of repaying George. The City of Dallas received the benefit of all the money advanced by George, in that the money went into permanent improvements on the property belonging to the City of Dallas, and such improvements thereby became the City's property. We are unable to find any provision in the contract under which it could be fairly stated that the City is entitled to recover this money. Neither is the City entitled to the money under any principle of equity. The money which George advanced was used by the State Fair to pay bills for labor and material used in the construction of the plant. The City of Dallas received the benefit of a valuable improvement. The City evidently recognized the rights of the parties in the contract of June 18, 1935, wherein the City required Texas Centennial to recognize the contract between the State Fair of Texas, the City and the Park Board with R. B. George, dated February 24, 1934, and the contract dated April 24, 1934, between the State Fair and R. B. George and in effect agreed that while the premises were in the hands of the Texas Centennial and subject to any amendment of the existing contract that Texas Centennial might make with R. B. George with respect to the operation of the race track that the funds which otherwise would be payable to the State Fair of Texas, towit, 40% of the net proceeds after the payment of any advancements due to R. B. George, for the account of the State Fair of Texas are repaid, shall be deposited in a named bank in a special trustee's account." The parties stipulated that on April 24, 1934, that all work, i. e., on the racing plant, requiring expenditures above $141,000.00 had been contracted for but not paid and at that time the State Fair of Texas had no funds to pay. Under these circumstances an emergency existed within the provisions of the earlier contract. The State Fair of Texas had the right under its contract with the City to use its part of the net profits so long as they were used in the making of a permanent improvement, which had theretofore been agreed to by the Park Board. We are unable to find any provision of the contracts to which the City is a party or any rule of equity that would require George to account to the City for the advancement which he made to the State Fair of Texas, for the purpose of paying off and discharging bills for labor and material used in the construction of the plant. It is clear, therefore, that the City of Dallas has shown no right to a recovery of any sum which George advanced to the State Fair of Texas for the completion of the construction of the racing plant.

■ We are also of the opinion that the City has no right to a recovery of 40% of the amounts which were paid to George by

Texas Centennial and others. In June, 1935, the State Fair of Texas, Texas Centennial and the City of Dallas, as above stated, entered into a contract under which the State Fair relinquished all of its rights to Fair Park (which includes the racing plant) during the period of the Texas Centennial, and in effect the Texas Centennial succeeded to all the rights of the State Fair of Texas under the preexisting contracts. A similar contract was made on February 26, 1937, between the City, the Park Board and Greater Texas and Pan-American Exposition. In the first of these contracts it was contemplated that racing would be held and provision was made for the payment of certain indebtedness of the State Fair of Texas with its proceeds from racing after repayment to George of all of the advance made to it by him. Thereafter, the Texas Centennial decided that the grounds upon which the racing plant had been constructed would be needed for another purpose and entered into a contract with George, Texas Centennial and State Fair of Texas, wherein such arrangements were effected and in consideration of "the losses which R. B. George personally will sustain by virtue of his not being able to profit from the use of said property for racing purposes during said year," the corporation promised to pay to R. B. George the sum of $85,000.00. We quote a paragraph from that contract:

"The City of Dallas and its Park Board have consented to the execution and delivery of this agreement by the adoption of a resolution of the Park Board, a copy of which is attached hereto as "Exhibit 'A,' and the adoption of a resolution by the City Council of the City of Dallas, a copy of which is attached hereto as Exhibit 'B.'

The resolution of the Park Board provided "that in order ot hold said celebration and put through the improvement program, it is necessary that no races be held" and that the Park Board therefore "expressly consents at the special instance of the Texas Centennial Exposition and R. B. George that R. B. George and the Texas Centennial Central Exposition shall be relieved of the obligation of holding a race meet in Fair Park during the year 1936, and in the event the City of Dallas and its Park Board assent to the extending of the Centennial celebration for the year 1937, or a part thereof, that the race meet need not be held in the Fair grounds during the year 1937." It is true that the resolution provided that "without in any way ratifying or recognizing any contract with reference to the building or operation of said track and plant to which the City of Dallas or its Park Board or either of them are not parties, the Park Board expressly consents" etc., but in our opinion this

can make no difference with reference to the disposition of this case. In the trial pleadings of the City it was contended that George procured the payment of these sums of money from the Centennial and its successor corporation without the knowledge or consent of the City, and that it was entitled to an accounting of this money from George as a trustee. The City introduced in evidence the contracts between George and the corporations wherein the corporations agreed to pay George the sums of money provided therein for the purpose of covering his losses on account of his being unable to conduct racing meets during the time involved and the City consented to these contracts. The City made no effort to prove that the City or the Park Board were not well aware of the payments to be made to George by the corporations as provided in these contracts. During the summer of 1937 the Legislature of the State of Texas repealed the law which authorized the pari-mutuel racing system and the Pan-American Corporation did not thereafter exercise its option under the contract with R. B. George. With respect to the sum of $45,000.00 which it was contended by the City that George was paid by the Arlington Downs interest, or sometimes called "The Waggoners," it was in evidence that Mr. George received $45,000.00 from that source under a contract, and during the trial the contract was exhibited to counsel for the City of Dallas, but the contract was not offered in evidence.

A statement of the foregoing facts, we think, clearly demonstrates that the City of Dallas is not entitled to the 40% of the sum paid to R. B. George to cover his losses for not being able to conduct racing meets during the period covered by the contracts. George had obligated himself under the contract between the State Fair of Texas and the City of Dallas to put up a maximum amount of $141,000.00 and in consideration for the advancement of this sum of money the parties agreed that he should have 60% of the net profits of the racing plant. When it developed in the conduct of the Centennial that the ground upon which the racing plant was constructed was needed for another purpose, George could demand compensation to cover his losses because of his being unable to use the plant as provided in the contract.

The Centennial Corporation and the Greater Texas and Pan-American Corporation and R. B. George could lawfully make any contract they desired for the purpose of compensating George for the losses he would necessarily sustain in virtue of not holding races in Fair Park during 1936 and 1937. It was necessary for the Centennial Corporation and the Greater Texas and Pan-American Corporation, in order to obtain the right to use

the property, to have the consent of the State Fair of Texas, R. B. George, the City of Dallas and the Park Board. The parties had the right to contract freely with respect to the property so long as each of the parties acted in good faith. The proof offered by the City does not raise the issue of bad faith on the part of any of the contracting parties. The City of Dallas could not expect one situated as R. B. George, who, by the expenditure of more than $140,000.00, had the right to receive 60% of the net profits derived from the operation of the race track, to consent for the property to be used for another purpose without compensation. The amount to be paid George was the concern of the contracting parties. The theory pleaded by the City was that George did not act in good faith in the negotiations and consummation of the contracts with the State Fair of Texas, the Centennial and the Greater Texas and Pan-American Corporation, and in obtaining the consent of the City and the Park Board to said contracts. The City's case in this regard is wholly without proof to support the theory pleaded. In fact, the contracts between the parties introduced in evidence by the City, through recitals quoted above, refute the pleaded theory. The City offered no proof to show that the City and the Park Board were not fully advised in the premises and were not fully informed as to the contents of the contracts.

It follows from these conclusions that the third contention of the City (as above stated) is without merit.

The City seeks to cancel the contract between the City, the State Fair of Texas and R. B. George dated the 24th day of February, 1934, because of the repeal by the Legislature of the State of Texas of the law which permitted the system of pari-mutuel betting on horse races. The contract was valid when made. Te repeal of the pari-mutuel law did not invalidate the contract. Houston Ice & Brewing Co. v. Keenan, 99 Texas 79, 88 S. W. 197. R. B. George in this suit is not trying to enforce the contract with respect to pari-mutuel betting on horse races. Horse racing may be conducted without the use of the pari-mutuel system. This contract may not be cancelled solely on the ground that one of the expected sources of revenue has been abolished by the repeal of the law which authorized it.

The judgment of the Court of Civil Appeals, which affirmed the judgment of the trial court, is affirmed.

Opinion adopted by the Supreme Court February 24, 1943.

Rehearing overruled April 7, 1943.